IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | CRIMINAL NO. 2:22-cr-126-002 |
| ) | |
| COLIN THOMAS COSTELLO, ) | |
| ) | |
| Defendant. ) | |

## **POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING**

The United States of America, through its attorneys, Jessica D. Aber, United States Attorney, and Kristin G. Bird, Assistant United States Attorney, hereby submits its position with respect to the defendant's sentencing factors. In the Presentence Investigation Report ("PSR") prepared in this matter, the United States Probation Office determined the applicable advisory guidelines range to be a term of 262 to 327 months' imprisonment, plus 60 months to be served consecutive, based on a Total Offense Level of 38 and a Criminal History Category of II.

In accordance with § 6A1.2 of the Sentencing Guidelines Manual and this Court's policy regarding sentencing, the United States represents that it has reviewed the PSR and consulted with the Probation Office and defense counsel. The United States does not dispute any of the sentencing factors set forth in the PSR or the guidelines range calculation and understands there to be no unresolved objections.

For the reasons outlined herein and after consideration of the PSR, the relevant conduct associated with this crime, the defendant's history and characteristics, and the defendant's criminal record, the United States respectfully seeks a downward variance and submits that an aggregate sentence of 240 months is appropriate, warranted, and not greater than necessary to accomplish

the goals of 18 U.S.C. § 3553(a).

I. **Background**

On October 5, 2022, the defendant and three other individuals were named in an eleven-count Indictment charging offenses related to drug trafficking and illegal firearm possession. ECF No. 3. Count One charged the defendant with Conspiracy to Distribute and Possess with Intent to Distribute Methamphetamine, in violation of 21 U.S.C. §§ 846 and 841(a)(1) and (b)(1)(A). *Id*. Counts Three and Four charged the defendant with Distribution of Methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). *Id*. Count Nine charged the defendant with Manufacture, Distribute and Possess with Intent to Distribute a Schedule II Controlled Substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). *Id*. Count Ten charged the defendant with Possess, Use, and Carry Firearms in Furtherance of and During and In Relation to a Drug-Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A). *Id*.

On January 26, 2023, the defendant entered guilty pleas to Counts One, Nine and Ten of the Indictment before United States Magistrate Judge Douglas E. Miller. He is scheduled to appear before this Court for sentencing on October 30, 2024.

II. **Position on Sentencing and Argument**

"[I]n imposing a sentence after *Booker*, the district court must engage in a multi-step process. First, the court must correctly determine, after making appropriate findings of fact, the applicable guideline range." *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006). "Next, the court must 'determine whether a sentence within that range serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors.'" *Id.* (quoting *United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006)). In making this determination,

> a sentencing court must consider "the nature and circumstances of the offense and the history and characteristics of the defendant" and

2

> the need "to reflect the seriousness of the offense," provide "just punishment," "afford adequate deterrence," "protect the public," and "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

*United States v. Hampton*, 441 F.3d 284, 287 (4th Cir. 2006) (quoting 18 U.S.C. § 3553(a)).

    A)    <u>Nature and Circumstances of the Offense</u>

The nature and circumstances of the offense are immensely serious. The defendant was illegally armed and engaged in a methamphetamine conspiracy responsible for transporting approximately fifteen (15) kilograms of methamphetamine—a dangerous and highly addictive controlled substance—from sources in Florida into the Hampton Roads area, where it was then distributed by the defendant and others to local methamphetamine addicts.[1]

Methamphetamine overdose deaths are on the rise, and this drug poses a growing threat to the public. According to the Virginia Department of Health's Chief Medical Examiner, the number of fatal overdose methamphetamine deaths in Virginia has skyrocketed in recent years, from a total of six in 2007 to 198 in 2019 and an estimated 385 in 2020—a year-over-year increase of 94% in the last year alone—and a 6,316% increase since 2007.[2] From 2020 to 2021, the number of deaths approached 600, an increase of approximately 41.6%.[3] This rise in fatalities has gone

---

[1] The lead investigative agent – Agent Harry Chang with the Department of Homeland Security – will be available at the sentencing hearing if needed to provide further details about the defendant, including his criminal conduct, any statements he made post-arrest, and/or this drug trafficking organization.

[2] *See* Virginia Department of Health, Office of the Chief Medical Examiner, Fatal Drug Overdose Quarterly Report, Fourth Quarter 2020, *available at* https://www.vdh.virginia.gov/content/uploads/sites/18/2021/04/Quarterly-Drug-Death-Report-FINAL-Q4-2020.pdf, pages 3 and 24.

[3] *See* Virginia Department of Health, Office of the Chief Medical Examiner, Fatal Drug Overdose Quarterly Report, Third Quarter 2022, *available at* https://www.vdh.virginia.gov/content/uploads/sites/18/2023/01/Quarterly-Drug-Death-Report-FINAL-Q3-2022.pdf, pages 3 and 24.

hand-in-hand with the increasing prevalence of extremely high-purity methamphetamine sourced from southern and western border states and, ultimately, from Mexico. Even where it is not fatal, methamphetamine, "a highly addictive central nervous system stimulant," is a serious drug that does dramatic harm to its users; its "use is associated with a range of health harms, including psychosis and other mental disorders, cardiovascular and renal dysfunction, infectious disease transmission, and overdose."[4] Compounding the problem, there are no approved medications effective at treating methamphetamine addiction—there is no methadone equivalent for methamphetamine.[5] As is true for heroin, fentanyl, and a host of other controlled substances, methamphetamine truly is a scourge on society, wreaking havoc in its users' lives, breaking families apart, and taking a severe toll on the public health social safety net.

In early 2022, local and federal law enforcement partners initiated an investigation focused on the defendant and the methamphetamine conspiracy to which he belonged. The investigation revealed that the defendant was working with Leonard Brooks ("Brooks"), Kyle Dean ("Dean"), and Katie Harbor ("Harbor") to distribute significant quantities of methamphetamine to others. Brooks would receive wholesale quantities of methamphetamine from a Florida-based supplier, which he then provided to the defendant through Dean. ECF No. 87 ¶¶ 10,11. The defendant would then distribute the methamphetamine to his many customers.

On April 6, 2022, law enforcement conducted a controlled purchase of methamphetamine

---

[4] *See* https://www.cdc.gov/mmwr/volumes/69/wr/mm6912a1.htm; *see generally* Quinones, "The New Meth," The Atlantic, Oct. 18, 2021, *available at* https://www.theatlantic.com/magazine/archive/2021/11/the-new-meth/620174/ (reporting on the increased trafficking of chemically pure methamphetamine and a concomitant rise in severe mental illness and homelessness).

[5] *See* https://www.nih.gov/news-events/nih-research-matters/trends-us-methamphetamine-use- associated-deaths.

from the defendant. He arrived at the agreed upon location in an Acura with a female. The defendant sold approximately 26.05 grams of methamphetamine in exchange for $600 in U.S. currency. *See* ECF No. 87 ¶ 4.

On April 12, 2022, law enforcement conducted another controlled purchase of methamphetamine from the defendant. He again arrived in the Acura with an unknown male driving. The defendant sold approximately 67.50 grams of 95% pure methamphetamine in exchange for $1400 in U.S. currency. *See* ECF No. 87 ¶ 5.

On April 22, 2022, law enforcement intercepted the defendant on his way to sell methamphetamine. ECF No. 87 ¶ 6. They conducted a lawful traffic stop, but prior to coming to a stop, the defendant threw suspected methamphetamine out of the vehicle's window. *Id*. Law enforcement recovered the substance and submitted it for chemical analysis. *Id*. The substance was approximately 58.83 grams of 92% pure methamphetamine. *Id*. He was taken into custody at that time and he admitted he was involved in this methamphetamine trafficking conspiracy.

On the same date, law enforcement executed multiple search warrants at residences affiliated with each co-conspirator. Below is a breakdown of what was found in each residence:

  i. In Brooks' residence, they recovered 219 grams of cocaine, a firearm, and over $26,000 in U.S. currency. ECF No. 100 at 5.

  ii. In Dean and Harbor's residence, they recovered approximately 7.19 grams of methamphetamine, digital scales, packing materials, and a drug ledger. ECF No. 109 at 10; ECF No. 125 at 5.

  iii. In the defendant's residence, which is where he and Amber Hendricks ("Hendricks") resided, law enforcement recovered approximately 436 grams of 94% pure methamphetamine, separated and packaged into sixteen bags and ready for distribution. ECF No. 87 ¶¶ 7, 8. They recovered other controlled substances, namely fentanyl, amphetamine, buprenorphine, and marijuana, in various quantities. They also recovered packaging materials, scales, and approximately fourteen firearms.

Once the co-conspirators were in custody, law enforcement learned that Brooks was expecting a shipment of pure methamphetamine from his Florida-based supplier to arrive in the Eastern District of Virginia on a train. ECF No. 87 ¶ 10. Working in conjunction with Homeland Security, agents with the Drug Enforcement Administration were able to intercept the train and detain the courier. *Id*. Upon searching the courier's suitcase, they found nearly eleven pounds or five kilograms of 100% pure methamphetamine. *Id*. This shipment was consistent, both in quantity and quality, with two previous shipments that arrived during the six months before takedown. ECF No. 87 ¶ 11. The train deliveries, combined with the substances found in the defendant's residence, resulted in the defendant being attributed with 129,518.75 kilograms of converted drug weight and an Offense Conduct of Level 38.

Law enforcement also learned that, in addition to engaging in this conspiracy, the defendant sourced methamphetamine from others based in the Commonwealth of Virginia and Georgia. According to information provided to law enforcement, the defendant traveled to Georgia with Hendricks and others so he could meet with his drug supplier. *See United States v. Amber Hendricks, a/k/a Amber Costello*, Case No. 2:23-cr-48, ECF No. 33 at 4. The defendant reportedly purchased approximately three pounds of methamphetamine from his Georgia supplier. The defendant told law enforcement post-*Miranda* that he had another Virginia-based supplier but said it had been months since he acquired methamphetamine from that person.

Law enforcement reviewed portions of the defendant's Facebook Messenger conversations as part of the investigation because the defendant frequently communicated with his co-conspirators and his customers on that platform. In these records, there were conversations where the defendant discussed methamphetamine pricing and made arrangements to meet customers to complete sales. They also found images depicting bags of methamphetamine, some

6

of which were sitting on scales, stacks/flashing of U.S. currency, and the defendant illegally possessing firearms. Below are examples of some of the images recovered.





Once the fourteen firearms were recovered from the defendant's residence, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") joined the investigation. ATF traced each of the firearms to determine who the original purchasers were so they could investigate how the defendant – a prohibited person – unlawfully came into possession of the firearms. The following

7

photos depict the eleven firearms that were found in the bedroom Hendricks shared with the defendant, each of which he had either actual or constructive possession of:















The trace reports revealed that four firearms were purchased by Jonathan Scott and were subsequently possessed by the defendant in furtherance of drug trafficking. *See United States v. Jonathan Morrell Scott*, Case No. 2:23-cr-51, ECF No. 22. Four other firearms were purchased by Hendricks in the four months preceding the search warrant. *See United States v. Amber Hendricks, a/k/a Amber Costello*, Case No. 2:23-cr-48, ECF No. 33 at 4. She told law enforcement they were her firearms, but she admitted that the defendant had access to them. *Id*. at 3.

    B)    <u>History and Characteristics of the Defendant – 18 U.S.C. § 3553(a)(1)</u>

        1.    Personal and Family Data

The defendant is a 35-year-old man who enjoys general good physical health. PSR ¶ 63. His parents divorced when he was young and, following the divorce, he was raised by his mother. PSR ¶ 59. He informed Probation that his mother "always worked hard to make ends meet and provided for him." *Id*. His father suffered from severe mental health problems and participated in his life sporadically. *Id*. However, his mother remarried when the defendant was nine or ten years old. *Id*. The defendant's stepfather appears to have been a positive role model – he served in the military and worked as a special education teacher. *Id*. According to the defendant, he was

10

never physically or emotionally abused by the parental figures in his life. *Id*.

Despite having what appears to have been a stable upbringing, the defendant struggled as a youth. He was diagnosed with various mental health conditions, had difficulty maintaining appropriate behavior while in school, and repeatedly found himself facing criminal charges.

According to a state PSR, the defendant was diagnosed at five years old with bipolar disorder, ADHD, and obsessive-compulsive disorder. PSR ¶ 66. In 2003, after nearly nine years of therapy, his therapist reported that the defendant "expressed violent and aggressive behavior and that he presented as oppositional and remorseless." *Id*. Treatment did continue in the form of in-home services and day treatment programs for over two more years. *Id*. While this case was pending sentencing, the defendant underwent a Forensic Evaluation. PSR ¶ 83. He was diagnosed with generalized anxiety and a "rule-out diagnosis of post-traumatic stress disorder." PSR ¶ 84.

Consistent with the behaviors noted by the therapist in 2003, the defendant experienced problems at school due to aggression, disruption, and acting-out behaviors. PSR ¶ 72. He was frequently tardy and absent as well. *Id*. He eventually dropped out of high school in the eleventh grade but he did obtain his General Educational Development ("GED") diploma while incarcerated. PSR ¶ 70.

Despite his involvement in drug trafficking, the defendant has denied any significant substance abuse issues. He claims he has not used marijuana since 2019 and never abused alcohol. PSR ¶ 68.

The United States respectfully submits that a juxtaposition of the defendant's upbringing with his criminal background begs the questions – what happened and why is this defendant here? There is nothing in the PSR that answers these questions. However, based on the past mental health history, the United States respectfully requests that the Court recommend additional mental

health evaluations and treatment while the defendant is housed in the Bureau of Prisons. The defendant would also likely benefit from educational and vocational training.

2.  Criminal History

The defendant's criminal history began at the age of 12 and is not accounted for in the criminal history calculation. Below is a list of his juvenile adjudications:

| AGE | CHARGE | DISPOSITION | POINTS |
|---|---|---|---|
| 12 | Simple Assault | Community Service and Good Behavior | 0 |
| 13 | Disturbing the Peace (also charged with Brandishing a Firearm) | Initially deferred, but defendant incurred new charges approximately seven months later. Eventually adjudicated delinquent and given a suspended commitment to the Department of Juvenile Justice ("DJJ") | 0 |
| 14 | Breaking and Entering; Grand Larceny; Threaten Bodily Harm | Suspended commitment to DJJ | 0 |
| 14 | Destroy Property | Community Service, Probation, Jail Tour | 0 |
| 14 | Threaten to Burn and Destroy Property | Tidewater Detention Home; Probation revoked and defendant was eventually ordered to serve 12 months in jail | 0 |
| 16 | Show Cause | 10 days in secure detention | 0 |

PSR ¶¶ 40-45.

Ultimately, the juvenile system failed to rehabilitate the defendant and get him on a path of law-abiding behavior. Shortly after turning eighteen, the defendant was charged with possession of a concealed weapon, second offense; possession of firearm by felon; conspiracy to commit robbery; robbery; and use of a firearm in the commission of a robbery. PSR ¶¶ 47-48.

12

The defendant and two other individuals beat one of the victims and robbed him of his personal property. PSR ¶ 48. Shortly after the robbery, law enforcement made contact with the defendant during a traffic stop. He had a pistol in his pocket that was loaded with two rounds of ammunition. PSR ¶ 47. The defendant was convicted on all charges, with the exception of the conspiracy offense. PSR ¶¶ 47-48. He was ordered to serve a total of thirteen years for these offenses. *Id*.

The defendant was released from the Department of Corrections on November 13, 2019. *Id*. He was terminated successfully from probation on April 1, 2021 but subject to uniform good behavior until November 13, 2025. *Id*. In less than a year after his release from probation, and while still on good behavior, the defendant committed the instant offenses.

Unfortunately, the defendant continued to commit crimes even after he entered a guilty plea to offenses that carry the potential of a life sentence. Just three months after entering his plea, the defendant, Hendricks, and a third individual ("J.F.") hatched a plan to introduce contraband into Western Tidewater Regional Jail. PSR ¶ 17. The defendant planned on selling the contraband for profit. *Id*.

On April 30 and May 1, 2023, the jail captured video recordings of the defendant, Hendricks, and J.F. discussing their multi-phase, multi-night plan to introduce contraband into the jail. During the April 30, 2023 calls, Hendricks told the defendant that she had previously walked through the woods at night scoping out the jail trying to determine which block he was in. Additionally, while being recorded, Hendricks used Google Earth to identify which block the defendant was housed in and J.F. pulled up a video of how to drill into the glass at the jail.

During the May 1, 2023 calls, the defendant and Hendricks made a list of approximately ten items they planned on smuggling into the jail. Additionally, Hendricks showed him where she had practiced drilling holes into a piece of acrylic glass she had in the house. They discussed that

13

lubricant would be needed, that the torque on the drill had to be turned all the way up, that the light on the drill needed to be covered, and that it took less than a minute to drill the hole. When Hendricks told him there would be noise associated with the drilling, the defendant told her another inmate would turn on the shower to mask the sound. The defendant also told her how he planned to cover the hole, but he needed her to bring some of the materials he would need. The defendant wanted everything delivered in one attempt. Hendricks insisted on executing this plan over at least two nights – the first night she would drill the hole and the second night she would deliver the contraband. Her rationale was that if she was caught drilling without contraband, then "worse comes to worse it's a trespassing charge."

Having discovered this nefarious plot, the jail activated its Emergency Response Team and developed a plan to apprehend Hendricks and any accomplices before the contraband could be introduced. Officers were positioned in the woods when, at approximately 4:00 a.m. on May 2, 2023, Hendricks and J.F. snuck onto the property. Officers apprehended and searched both individuals. Hendricks was found in possession of the drill, several tools needed to carry out their plan, and items "wrapped for smuggling."

Based on the defendant's continued criminal activity, the United States Probation Office appropriately declined to reduce the defendant's offense conduct level by two points pursuant to U.S.S.G. §3E.1.1(a), concluding he had not accepted responsibility for his criminal conduct. PSR ¶ 17.

    C)    <u>Relevant Sentencing Factors Outlined in 18 U.S.C. 3553(a)(2)</u>

In recommending an aggregate sentence of 240 months' imprisonment, the United States has attempted to account for the nature and circumstances of the offense, the defendant's criminal and personal history, his failure to accept responsibility for his actions, and the sentences imposed

in the related cases with all of the § 3553(a) factors.

The defendant was back in society for shortly over two years before he joined this drug trafficking conspiracy. And, when law enforcement searched his residence, they found nearly half a kilogram of methamphetamine and fourteen firearms, some of which were equipped with extended magazines. The sheer number of guns, magazines, and rounds of ammunition recovered prove this was a well-fortified residence in which drug use and drug trafficking took place. Therefore, in addition to having exhibited no respect for the law, the defendant also posed a significant risk to public safety.

It is well-accepted that the combination of drugs and guns poses a grave danger to those involved in the drug world and to innocent bystanders. "[D]rugs and guns form a lethal combination that can lead to violence." *United States v. Harris*, 128 F.3d 850, 852 (4th Cir. 1997); s*ee also Harmelin v. Michigan*, 501 U.S. 957, 1002 (1991 ("[V]iolent crime may occur as part of the drug business or culture."). "This is [especially] true when substantial drug trafficking is involved." *United States v. Manigan*, 592 F.3d 621, 630 (4th Cir. 2010); *see United States v. Kennedy*, 32 F.3d 876, 882 (4th Cir. 1994) ("[T]he law has uniformly recognized that substantial dealers in narcotics possess firearms ...." (internal quotation marks omitted)); *see also United States v. Wiener*, 534 F.2d 15, 18 (2d Cir. 1976) ("substantial dealers in narcotics keep firearms on their premises as tools of the trade.").

The risk that any defendant will continue to be involved in transporting or selling narcotics was repeatedly cited by Congress as an example of a danger to the "safety of any other person or the community." Section 3142 Leg. Hist., 1984 U.S.C.C.A.N. at 16, 22–23. "It is well known that drug trafficking is carried on to an unusual degree by persons engaged in continuing patterns of criminal activity. Persons charged with major drug felonies are often in the business of

15

importing or distributing dangerous drugs." *United States v. Williams*, 753 F.2d 329, 335 (4th Cir. 1985). And based on "the nature of the criminal activity with which they are charged, they pose a significant risk of pretrial recidivism." *Id.*

In this case, the defendant reoffended while in custody and while awaiting sentencing for offenses he knew were punishable by a possible life sentence. Therefore, the United States is left with little choice but to argue for a significant sentence. The recommended sentence of 240 months is absolutely necessary to protect the public from the defendant and his criminal mindset. This sentence will also hopefully promote respect for the law and achieve specific deterrence.

The United States' recommendation will not lead to unwarranted sentencing disparities. The co-conspirators have been sentenced as follows:

| Defendant | Role in Offense | Offense Conduct Level | Criminal History Level | Guidelines | Gov't Rec. | Sentence Received |
|---|---|---|---|---|---|---|
| Leonard Brooks | Supplier | 37 | VI | 360 – life + 60 m | 240m + 60m | 180m + 60m |
| Kyle Dean | Dealer | 35 | VI | 292 – 395m | 240m | 218m |
| Katie Harbor | Dealer | 35 | IV | 235 – 293m | 180m | 108m |
| Colin Costello | Dealer[6] | 38 | II | 262 – 372m + 60m | 180m + 60m | _____ |

The recommended sentence is a reflection of the defendant's role in the conspiracy, his actions outside of the conspiracy, and is consistent with the recommendations made in the co-conspirators' cases.

The defendant does have a lower criminal history, but he has been engaging in conduct since he was twelve. Moreover, his past convictions involved firearms, were violent, and

---

[6] Brooks supplied the defendant through Dean, but the investigation revealed the defendant had additional suppliers, including one based in Georgia.

ultimately resulted in thirteen years of incarceration. Within three years of his release, the defendant managed to establish connections with methamphetamine suppliers, both within and outside the Commonwealth of Virginia, who enabled him to distribute significant quantities of high-quality methamphetamine in our community. And, despite being incarcerated and aware of the maximum penalties applicable in this case, the defendant continued to engage in criminal conduct.

The United States respectfully submits that the recommended sentence is based on a thorough reflection of all of the § 3553(a) factors and encourages the defendant to take advantage of all of the rehabilitation programs the Bureau of Prisons has to offer. In so doing, the public will be safer and he will hopefully be specifically deterred from committing further crimes.

### III. Conclusion

Taking all the Section 3553(a) factors into account, the government submits that an aggregate sentence of 240 months is appropriate and would be sufficient, but not greater than necessary, to accomplish the goals of 18 U.S.C. § 3553(a).

Respectfully submitted,

Jessica D. Aber
United States Attorney

By:     /s/
Kristin G. Bird
Assistant United States Attorney
United States Attorney's Office
101 West Main Street, Suite 8000
Norfolk, VA 23510
Office Number: 757-441-6331
Facsimile Number: 757-441-6689
Email: kristin.bird@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that on October 23, 2024, I electronically filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of record.

I also certify that on October 23, 2024, I sent by electronic mail a true and correct copy of the foregoing to the following:

**Robert K. Bell**
United States Probation Officer
600 Granby Street, Suite 200
Norfolk, Virginia 23510
(757) 222-7331

By:     /s/
Kristin G. Bird
Assistant United States Attorney
101 W. Main Street, Suite 8000
Norfolk, Virginia 23510
Office Number: (757) 441-6331
Facsimile Number: (757) 441-6689
Email: kristin.bird@usdoj.gov